Michael R. Lozeau (CA Bar No. 142893)
Brian B. Flynn (CA Bar No. 314005)
E-mail: michael@lozeaudrury.com
         brian@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Natalie R. Herendeen (CA Bar No. 299286)
Email: natalie@montereywaterkeeper.org
MONTEREY WATERKEEPER
PO Box 4311
Salinas, CA 93912
Tel: (831) 204-1381

Attorneys for Plaintiff
MONTEREY WATERKEEPER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY WATERKEEPER,<br><br>                    Plaintiff,<br><br>        v.<br><br>COUNTY OF SANTA CRUZ,<br><br>                    Defendant. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

COMPLAINT

Plaintiff MONTEREY WATERKEEPER ("Waterkeeper"), by and through its counsel, alleges as follows:

## INTRODUCTION

1.      This is a third-party enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "the Act"), 33 U.S.C. § 1365(a)(1), to address violations of the Act by Defendant County of Santa Cruz ( "Defendant" or "County") arising out of discharges of polluted storm water from the County's industrial landfill facility located at 1231 Buena Vista Drive in Watsonville, California 95076 ("Facility"). Since on or before January 2, 2021, Defendant has been discharging and continues to discharge polluted storm water from the Facility, in violation of the express terms and conditions of the General Industrial Stormwater Permit issued by the State of California, National Pollutant Discharge Elimination System ("NPDES") Permit General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 2014-0057-DWQ (collectively, the "General Permit") and Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342. Waterkeeper seeks a declaratory judgment, injunctive relief, civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Act.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3.      On November 14, 2025, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and to

Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of Waterkeeper's notice letter is attached as **Exhibit A**, and is incorporated by reference.

4.      More than sixty (60) days have passed since the notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## DIVISIONAL ASSIGNMENT

6.      Divisional assignment of this matter to the San Jose Division of the Court is appropriate pursuant to Civil Local Rule 3-2(e). The events or omissions which give rise to Waterkeeper's claims occurred in Santa Cruz County, which is under the jurisdiction of the San Jose Division of the Northern District of California.

## PARTIES

7.      Plaintiff Monterey Waterkeeper is a 501(c)(3) environmental, non-profit public benefit organization in accordance with the laws of the State of California. Using law, policy, and science, Waterkeeper protects and restores drinkable, fishable, and swimmable waters in the Monterey Region and along California's Central Coast for all to enjoy. Monterey Waterkeeper conducts outdoor education and policy advocacy to ensure that all Central Coast residents have access to clean waters. Monterey Waterkeeper's outdoor education activities for youth and families allow participants to enjoy water quality testing, wildlife viewing, kayaking and hiking in Harkins Slough and Monterey Bay. Monterey Waterkeeper also actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of Waterkeeper use and enjoy Monterey Bay and its tributaries, including Gallighan Slough, Harkins Slough, Watsonville Slough, and the Pajaro River, and the areas around

these waters, for recreation, such as kayaking, picnicking, fishing, hiking, as well as for enjoyment of wildlife, including nearby populations of marine mammals such as sea otters and seals. Unlawful discharges of pollutants from the Facility into these waters impairs Waterkeeper's members' use and enjoyment of these waters.

9.    Defendant's violations of the CWA and the Storm Water Permit, including but not limited to its failure to monitor and/or report discharges, also injures Waterkeeper's ability to further its mission to protect California's waters.

10.    The interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the General Permit.

11.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy, or adequate remedy at law.

12.    Defendant SANTA CRUZ COUNTY owns and operates the Facility that is at issue in this action.

## REGULATORY BACKGROUND

### The Problem of Storm Water Pollution

13.    Storm water runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, storm water can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate and nitrite.  Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects.  Heavy metals have been shown to alter activity in the tissue and blood of fish.

14.    High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS have been shown to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are adsorbed onto TSS.  Thus, higher concentrations of TSS mean higher

concentrations of toxins associated with those sediments.  Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species' richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

**The Clean Water Act**

15.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16.     Section 402(b) of the Act, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, the EPA has approved the State Board and its nine Regional Boards to administer an NPDES permit program for the State.  The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

17.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

18.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application.  40 C.F.R. § 122.21.

19.     Section 301(b) of the Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations

by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

20.    Section 505(a)(1) of the Act provides for third-party enforcement actions against any "person," including the United States, any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution, individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

21.    Section 505(a) of the Act authorizes third-party enforcement actions for injunctive relief.  33 U.S.C. § 1365(a).

22.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1), 1365(f), 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1-19.4.

### The General Permit

23.    The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The current version of the General Permit went into effect on July 1, 2015.

24.    In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

25.    The General Permit contains several prohibitions.  Effluent Limitation V(A) prohibits discharges unless pollutants have been reduced or prevented through implementation of BAT and

BCT.  Discharge Prohibition III(C) prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

26.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

27.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  General Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  *Id*., § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  *Id*., Fact Sheet § I(1).

28.    Section X of the General Permit sets forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of

significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Dischargers must develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations and receiving water limitations.

29.    The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *Id*., § X(H)(1).  Failure to implement these minimum BMPs is a violation of the General Permit. *Id*., Fact Sheet § I(2)(o).  The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *Id*., § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*.  The General Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table. *Id*., § X(H)(4), (5).

30.    The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP"). *See* General Permit, §§ X(I), XI.  The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  Adequate monitoring and reporting ensures that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a

significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The General Permit mandates that facility operators sample four storm water discharges from all storm water discharge locations at a facility over the course of the reporting year.  *Id*., §§ XI(B)(2), (3).

31.    Under the General Permit, facilities must analyze storm water samples for TSS, oil and grease ("O&G"), pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code.  General Permit, § XI(B)(6).

32.    The State of California maintains a list of impaired waterways pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).  Gallighan Slough is listed on the 303(d) list as category 4 for indicator bacteria. Harkins Slough is a 303(d) listed category 5 impaired waterway for chlorophyll-a, indicator bacteria, dissolved oxygen, toxicity, and turbidity. Watsonville Slough is also a 303(d) listed category 5 impaired waterway for a number of pollutants including: chlorpyrifos, copper, DDE (Dichlorodiphenyldichloroethylene), imidacloprid, malathion, nickel, nitrate, and dissolved oxygen.

33.    Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A).

34.    Section XI(B)(2) of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).  Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge.  General Permit, § XI(B).  A sample must be collected from each discharge point at the

facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period.  General Permit, § XI(B)(5).

35.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit, § XV.  Per Section XV(F) of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs."  After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation."  *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year."  General Permit, § XVI.

36.    The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

37.    EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; and iron – 1.0 mg/L.

38.    The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs.  The following annual NALs have been established under the General Permit: total suspended solids ("TSS") – 100 mg/L; zinc – 0.26 mg/L; COD – 120 mg/L; iron – 1.0 mg/L; and aluminum – 0.75 mg/L. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

39.      An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.

40.      The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs.  General Permit § XII(A).  If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred.  General Permit, § XII(C).

41.      By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation.  General Permit, § XII(C)(1).  As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.*  No later than January 1 following commencement of Level 1 status, the Discharger must submit via the Stormwater Multiple Application and Report Tracking System ("SMARTS") a Level 1 ERA Report.  General Permit, § XII(C)(2).  The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.*  A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

42.      If sampling results for a given parameter indicate an NAL exceedance while the Discharger is in Level 1 status for that same parameter, the Discharger attains "Level 2 status," which commences on July 1 following the reporting year during which the exceedance occurred.  General Permit, § XII(D).

43.     By January 1 following the commencement of Level 2 status, the Dischargers must submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance.  General Permit § XII(D)(1)(a).  The Level 2 ERA Action Plan must identify which demonstrations (Industrial Activity BMPs Demonstration, Non-Industrial Pollutant Source Demonstration, and/or Natural Background Pollutant Source Demonstration) the Discharger has selected to perform.  *Id.*  The Level 2 ERA Action Plan must include a schedule and a detailed description of the tasks required to complete the Discharger's selected demonstration(s).  General Permit, § XII(D)(1)(e)

44.     By January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger with Level 2 status must submit via SMARTS a Level 2 ERA Technical Report prepared by a QISP.  General Permit § XII(D)(2).  The Level 2 ERA Technical Report must include an Industrial Activity BMPs Demonstration, a Non-Industrial Pollutant Source Demonstration, and/or a Natural Background Pollutant Source Demonstration.  *Id*.  Dischargers who submit an Industrial Activity BMPs Demonstration in accordance with sections XII(D)(2)(a)(i) through XIID(2)(a)(iii) of the General Permit and who have implemented BMPs to prevent future NAL exceedance(s) return to baseline status if the results from four consecutive QSEs indicate no NAL exceedance(s) for the parameter(s) for which the Discharger has obtained Level 2 status.  General Permit, § XII(D)(4)(a).

**The Basin Plan**

45.     Section 303 of the Act, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.  The Act prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

46.     The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan, which contains Water Quality Standards for water bodies within its geographic area.

47.     The Central Coast Regional Water Quality Control Board has adopted the "Water Quality Control Plan for the Central Coastal Basin, June 2024 Edition" ("Basin Plan"), which sets

forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries.

48.    The beneficial uses attributed to Gallighan and Harkins Slough in the Basin Plan include water contact and non-contact recreation and commercial and sport fishing. Water Contact Recreation (REC-1) is defined in the Basin Plan as including swimming, fishing, and wading, while Non-Contact Water Recreation (REC-2) includes activities such as picnicking, sunbathing, hiking, sightseeing, and aesthetic enjoyment among other examples. Both Sloughs also serve beneficial uses as habitats that support rare, threatened, and endangered species, fish spawning, warm water, estuarine, and terrestrial ecosystems, and biological habitats of special significance.

49.    The Basin Plan establishes Freshwater Water Quality Objectives related to beneficial uses of the water. Section 3.3.2 of the Basin Plan outlines water quality standards for all inland surface waters. Of particular relevance to the Facility's exceedances is the Basin Plan requirement that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. The Basin Plan also requires that the beneficial uses of inland waters not be adversely affected by suspended sediment load and discharge rates, suspended materials, settable material, inorganic chemicals, and substances toxic to human, plant, animal, or aquatic life.

## STATEMENT OF FACTS

### The Facility

50.    The County owns and operates the Facility located at 1231 Buena Vista Drive in Watsonville, California.

51.    The Facility falls within SIC Code 4953 (Refuse Systems).

52.    The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 3 44I001258.

53.    The Facility occupies an area of approximately 119 acres.

54.    The Facility is regulated by the General Permit.

55.    On or around April 27, 1992, the County submitted its first NOI to comply with the General Permit to the State Board.

56.    On May 29, 2015, the County submitted an updated NOI classifying the Facility under SIC Code 4953 (Refuse Systems).

57.     Plaintiff is informed and believes, and thereupon alleges, that storm water is collected and discharged from the Facility via at least eleven storm water discharge locations.

58.     Plaintiff is informed and believes, and thereupon alleges, that storm water discharges from the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

59.     Industrial activities at the Facility include: receiving and sorting, spreading, and compacting waste; receiving and processing yard, wood, asphalt, concrete, and scrap metal waste; managing landfill gas and landfill gas co-generation plant; recovering and collecting landfill leachate; receiving, bailing, and storing bailed recyclables, recycling demolition and construction waste; collecting and bulking household hazardous waste and used oil products; fueling, maintaining, and washing vehicles and equipment; and maintaining the closed landfill cap.

60.     The Facility discharges storm water into the Gallighan Slough, which merges with the Harkins Slough less than a mile downstream from the Facility. The Gallighan Slough and Harkins Slough are tributaries to the Watsonville Slough which feeds into the Pajaro River and empties into Monterey Bay. Gallighan Slough, Harkins Slough, Watsonville Slough, Pajaro River, and Monterey Bay are referred to herein as the "Facility Receiving Waters."

61.     Plaintiff is informed and believes, and thereupon alleges, that the Facility Receiving Waters are waters of the United States.

62.     Plaintiff is informed and believes and thereupon alleges that storm water flows over the surface of the Facility where industrial activities occur.

63.     Plaintiff is informed and believes and thereupon alleges that storm water flowing over these areas collects particulates and pollutants including TSS, iron, aluminum, and COD, and other pollutants, as it flows towards the storm water discharge locations.

**Discharges in Violation of Permit and Violations of the
General Permit's Requirement for BMPs that achieve BAT and BCT**

64.     Plaintiff is informed and believes, and thereupon alleges, that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the

sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

65.    Plaintiff alleges that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

66.    Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual and instantaneous NALs.

67.    In storm water sampling results submitted to the State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

68.    The Facility has reported numerous discharges in excess of applicable NALs and EPA benchmarks for TSS, iron, aluminum, and COD.  These discharges of pollutants from the Facility have violated Discharge Prohibitions III(B) and III(C) and Receiving Water Limitations VI(A) and VI(B) of the General Permit and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.

69.    The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively.  For example, on November 1, 2022, the level of TSS measured at one of the Facility's storm water outfalls was 8280 mg/L.  That level of TSS is more than *eighty* times the benchmark value and annual NAL for TSS.  Defendant also measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on the following dates: March 17, 2025; February 13, 2025; February 4, 2025; December 14, 2024; November 25, 2024; February 7, 2024; February 1, 2024; January 22, 2024, December 18, 2023; February 24, 2023; January 4, 2023; November 8, 2022; November 1, 2022; April 21, 2022; December 13, 2021; November 9, 2021; October 21, 2021; March 10, 2021; February 2, 2021; January 27, 2021; January 22, 2021; and January 4, 2021.

70.    The levels of TSS in storm water detected by the Facility have exceeded the

instantaneous maximum NAL for TSS of 400 mg/L established by the State Board because two or more analytical results from samples taken for TSS within a reporting year exceeded the instantaneous maximum NAL value.  Defendant measured two or more samples taken within a reporting year exceeding the instantaneous maximum NAL value for TSS of 400 mg/L in each of the last five reporting years.

71.    The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1.0 mg/L established by EPA and the State Board, respectively.  For example, on February 4, 2025, the level of iron measured at one of the Facility's storm water outfalls was 66.2 mg/L.  That level of iron is over *sixty-two* times the benchmark value and annual NAL for iron.  Defendant measured levels of iron in excess of 1.0 mg/L in every storm water discharge it measured from the Facility during the past four reporting years, including the following dates: March 17, 2025; February 13, 2025; February 4, 2025; December 14, 2024; November 25, 2024; February 7, 2024; February 1, 2024; January 22, 2024, December 18, 2023; February 24, 2023; January 4, 2023; November 8, 2022; November 1, 2022; April 21, 2022; March 28, 2022; December 13, 2021; November 9, 2021; October 21, 2021; March 10, 2021; February 2, 2021; January 27, 2021; January 22, 2021; January 4, 2021; and December 17, 2020.

72.    The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on December 18, 2023, the level of aluminum measured at one of the Facility's storm water outfalls was 33.3 mg/L.  That level of aluminum is over *forty-four* times the benchmark value and annual NAL for aluminum.  Defendant measured levels of aluminum in excess of 0.75 mg/L in all but one storm water discharge it measured from the Facility during the past five reporting years, including the following dates: March 17, 2025; February 13, 2025; February 4, 2025; December 14, 2024; November 25, 2024; February 7, 2024; February 1, 2024; January 22, 2024, December 18, 2023; February 24, 2023; January 4, 2023; November 8, 2022; November 1, 2022; April 21, 2022; December 13, 2021; November 9, 2021; October 21, 2021; March 10, 2021; February 2, 2021; January 27, 2021; January 22, 2021; and January 4, 2021.

73.    The levels of COD in storm water detected by the Facility have exceeded the

benchmark value and annual NAL for COD of 120 mg/L established by EPA and the State Board, respectively.  For example, on February 4, 2025, the level of COD measured at one of the Facility's storm water outfalls was 1550 mg/L.  That level of aluminum is almost *thirteen* times the benchmark value and annual NAL for COD.  Defendant measured levels of aluminum in excess of 120 mg/L in storm water discharge it measured from the Facility one the following dates: March 17, 2025; February 13, 2025; February 4, 2025; December 14, 2024; November 25, 2024; February 7, 2024; February 1, 2024; January 22, 2024, December 18, 2023; February 24, 2023; January 4, 2023; November 8, 2022; November 1, 2022; April 21, 2022; November 9, 2021; October 21, 2021; March 10, 2021;; January 22, 2021; January 4, 2021; and December 17, 2020.

74.    Plaintiff is informed and believes, and thereupon alleges, that storm water discharges have occurred from the Facility on the dates listed in Attachment A of Exhibit A to this Complaint.

75.    On information and belief, Plaintiff alleges that since at least January 2, 2021, Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, iron, aluminum, COD, and other potentially un-monitored pollutants.  Effluent Limitation V.A of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. See General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. Id. A facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

76.    The Facility's Level 2 ERA Technical Reports going back to 2022 demonstrate that the County has continued to rely on ineffective BMPs or failed to implement BMPs year after year despite continued NAL exceedances. For example, for BMPs related to discharge point WQU1, every Level 2

Technical Report dating back to 2023 lists the same four BMPs, which have not made any noticeable reduction in the sampling results for WQU1.

77.    As of the 2024-2025 Reporting Year, the Facility entered at least its sixth reporting year with exceedances of TSS, iron, aluminum, and COD. However, the Facility's most recent Level 2 Technical Report, dated June 26, 2025, contained only seven (7) additional BMPs, two of which merely updated the Facility's SWPPP to map new discharge points and two of which pertained to cleaning out those discharge points (which are not sampled and are not contributing to the Facility's documented exceedances). The remaining three (3) BMPs (secondary containment for portable toilet; track out control for one road segment; and prompt pickup of spills) are plainly inadequate to remedy the NAL exceedances at the Facility.

78.    On information and belief, Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and water quality standards demonstrate that the Defendant has failed and continue to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards. Based on the pollutant levels in the Facility's storm water discharges, the BMPs implemented to date at the Facility do not represent BAT and BCT.  Plaintiff is informed and believes, and thereupon alleges, that treatment or other additional advanced BMPs are available that can be feasibly installed and operated at the Facility. As of the date of this Complaint, Defendant has failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

**Violation of Requirement to Prepare, Implement, Review,
and Update an Adequate Storm Water Pollution Prevention Plan**

79.    Plaintiff alleges that Defendant has failed and continue to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the General Permit.

80.    The General Permit requires SWPPPs to identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. General Permit, § X(H)(4)(b). Given the ongoing high levels of TSS, iron, aluminum, and COD measured in the Facility's discharge, in order to comply with the General Permit's BAT/BCT requirement, the Facility's SWPPP must identify additional advanced BMPs necessary to implement the BAT/BCT requirements and

achieve the NALs, and explain why available BMPs are not being implemented at the Facility. Defendant is violating Section X(H)(4)(b) because the SWPPP does not identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion.

81.    Plaintiff alleges that Defendant is in violation of the General Permit because the Facility's SWPPP fails to identify additional advanced BMPs and justify why they are not being implemented at the Facility.

82.    Plaintiff alleges that Defendant is in violation of Section X.H.4.b of the General Permit because the Facility's SWPPP fails to justify why additional treatment systems developed in accordance with Section X.H.6 of the General Permit have not been implemented at the Facility, despite the Facility's Level 2 Status for aluminum, iron, TSS, and COD. The SWPPP makes no mention of the "technological availability and economic practicability and achievability" of additional treatment systems at the Facility as required by Section X.H.4.b.

83.    Plaintiff alleges that Defendant's failure to update the SWPPP to justify why additional BMPs, including additional treatment systems, have not been implemented at the Facility, despite continuing NAL exceedances, is a violation of the General Permit that has occurred every day since at least January 2, 2021 and is ongoing.

84.    The General Permit requires that a facility's SWPPP contain a site map which includes, *inter alia*, "[l]ocations of storm water collection and conveyance systems, associated discharge locations, and direction of flow. Include any sample locations if different than the identified discharge locations." General Permit § X.E.3.b.

85.    The Facility's most recent SWPPP Amendment No. 5 submitted June 26, 2025, includes an updated Monitoring Implementation and Reporting Plan ("MIP"). Table 6.3 in the updated MIP purports to list the Facility's sampling locations and provides Map ID Numbers for each sampling location. The Map ID Numbers are meant to correspond to the updated Site Map submitted with SWPPP Amendment No. 5.

86.    The updated 2025 Site Map is inconsistent with the Map ID Numbers provided in Table 6.3 of the updated MIP. For every sampling location, the Map ID number provided in the MIP is different than the number provided in the SWPPP Site Map's legend. As a result of this inconsistency,

the SWPPP's Site Map is inconsistent with the SWPPP's MIP. These same errors were also present in the Facility's previous SWPPP Site Map and MIP submitted on January 26, 2022.

87.    Plaintiff alleges that Defendant's failure to provide an accurate SWPPP Site Map is a violation of the General Permit that has occurred every day since at least January 26, 2022, and is ongoing.

88.    According to information available to Plaintiff, the Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

**Violation of Requirement to Comply with**
**General Permit Evaluation and ERA Requirements**

89.    The SWCRB has identified the Facility as Level 1 and Level 2 for various parameter exceedances since 2016. As of the 2024-2025 reporting year, the Facility has retained its Level 2 status for TSS, iron, aluminum, and COD. The Facility submitted its most recent Exceedance Response Action ("ERA") Level 2 annual report on June 26, 2025.

90.    Similar to previous Technical Reports submitted for the Facility, the Facility's 2025 Level 2 Technical Report fails to identify  pollutant sources and corresponding industrial pollutants causing the NAL exceedances as required in the BMP Demonstration.

91.    The Facility's 2025 Technical Report, like the Technical Reports before it, does not set forth BMPs that have any likelihood of eliminating the NAL exceedances, does not achieve either the requisite BAT or BCT standard, and relies on an unsupported conclusion that the BMPs identified in the Technical Report, once fully implemented, will meet NALs at the Facility.

92.    The Facility's 2025 Technical Report, like the Technical Reports before it, only addresses BMPs to reduce iron levels in Drainage Area 4 despite the Facility's consistent iron exceedances from nearly every outfall.

93.    The Facility's 2025 Technical Report, like the Technical Reports before it, does not specifically address aluminum despite Facility exceedances dating back to 2016.

94.    The Facility's 2025 Technical Report, like the Technical Reports before it, does not address the causes and specific BMPs to address the Facility's COD exceedances.

95.     The Facility's 2025 Technical Report, like the Technical Reports before it, fails to include an estimated cost of the BMPs and an analysis describing the basis for selection.

96.     Because it is a violation of the General Permit to fail to comply with the Level 2 status ERA requirements in the event of NAL exceedances, Defendant's failure to prepare an adequate Technical Report is ongoing.

**Violation of Monitoring and Reporting Requirements**

97.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year and two QSEs within the second half of each reporting year. Section XI.B.1 of the General Permit defines a QSE as a precipitation event that both produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

98.     Plaintiff is informed and believes, and thereupon alleges, that Defendant took samples at the Facility and reported the results to SMARTS on dates that did not qualify as QSEs.

99.     On information and belief, Plaintiff alleges that Defendant took and reported samples to SMARTS on the following dates, which do not qualify as QSEs due to precipitation events within the preceding 48 hours: January 4, 2021; January 27, 2021; March 10, 2021; October 21, 2021; November 9, 2021; December 13, 2021; March 28, 2021; April 20, 2022; November 8, 2022; January 4, 2022; February 24, 2022; December 18, 2023; December 14, 2024; and February 13, 2025.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Failure to Implement the Best Available and Economically Achievable**
**and Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

100.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

101.     Effluent Limitation V(A) of the General Permit as well as its SWPPP requirements require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, iron,

aluminum, COD, and other potentially un-monitored pollutants in violation of Effluent Limitation V(A) of the General Permit.

102.    Each day since January 2, 2021, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

103.    Defendant has been in violation of the BAT/BCT requirements every day since January 2, 2021.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

104.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

105.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

106.    Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

107.    Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

108.    Each day since January 2, 2021, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

109.    Defendant has been in violation of the General Permit's SWPPP requirements every day since January 2, 2021.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**
**Failure to Comply with Requirement for Exceedance Response Actions**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

110.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

111.    Section XII(D)(2)(a) of the General Permit requires that an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report contain, *inter alia*, when implemented BMPs are not expected to eliminate future NAL exceedances, "1) [a]n evaluation of additional BMPs that would reduce or prevent NAL exceedances; 2) [e]stimated costs of additional BMPs evaluated; and, 3) [a]n analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented."

112.    Defendant has failed to submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report that complies with the requirements of Section XII(D)(2)(a) of the General Permit.

113.    Each day since at least January 2, 2021, that Defendant has failed to prepare and submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  This is an ongoing and continuous violation of the Act.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate Monitoring Implementation Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

114.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

115.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

116.    Defendant's ongoing failure to develop and implement an adequate MIP program is evidenced by, *inter alia*, Defendant's sampling and reporting of storm water on dates that

COMPLAINT                                                    22

do not qualify as QSEs.

117.    Each day since at least January 2, 2021, that Defendant has failed to develop and implement an adequate MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

118.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

119.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

120.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pollutants at levels above applicable water quality standards.  The storm water from the Facility flows untreated into channels that flow into the Facility Receiving Waters.

121.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit. Plaintiff is informed and believes, and thereupon alleges, that the Facility's discharges of pollutants are causing or contributing to violations of the Basin Plan's objectives prohibiting discharges of floating material, suspended material, settleable material, biostimulatory substances, sediment, turbidity, and toxic substances that

adversely affect beneficial uses.

122.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

123.    Every day since at least January 2, 2021, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests this Court to grant the following relief:

a.    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.    Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.    Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.    Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.    Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

g.    Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

h.    Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.    Order Defendant to prepare an adequate Level 2 ERA Technical Report;

j.    Order Defendant to pay civil penalties of up to $68,445 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

k.    Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

l.    Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

m.    Award any such other and further relief as this Court may deem appropriate.

Respectfully submitted,


Dated:  March 3, 2026                    LOZEAU DRURY LLP


                                          _/s/ Brian B. Flynn_____
                                         Brian B. Flynn
                                         Attorneys for Plaintiff MONTEREY WATERKEEPER

COMPLAINT                              25